UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                    Plaintiff,<br><br>         v.<br><br>MARIO ANTONIO SALCIDO,<br><br>                    Defendant. | No.  1:21-cr-00127-ADA-BAM-1<br><br>ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br>(ECF No. 26) |

This matter is before the Court on Defendant Mario Antonio Salcido's motion to suppress. (ECF No. 26.) On July 10, 2023, the Court held a hearing on the motion. (ECF No. 46.) Attorney Antonio Pataca appeared for the United States and Attorney Timothy Hennessy appeared for Defendant. (*Id*.) After a consideration of the moving papers and the arguments of the parties, the Court will deny Defendant's motion.

**BACKGROUND**

**A. Procedural History**

On May 13, 2021, the government charged Defendant with one count of 18 U.S.C. § 922(g)(1)—a Felon in Possession of a Firearm. (ECF No. 1 at 1.) That day, the Court issued a warrant for his arrest. (ECF No. 2.) On June 8, 2021, the Court issued a detention order, after a hearing, ordering Defendant to be detained. (ECF No. 5.) Defendant filed the present Motion to Suppress on July 6, 2022. (ECF No. 26.) The government opposed May 22, 2023. (ECF No.

1  38.) Defendant replied June 20, 2023.  (ECF No. 42.)

2  **B. Factual Background**

3  At 6:25 P.M. on February 12, 2021, Officer Nathan Hannah and Officer Trevor Bohny were conducting proactive policing in the area of N West Avenue / W. McKinley Avenue in Fresno.  (ECF No. 38-1 at 6.)  On route, the officers noticed Defendant driving a silver 2001 Honda Civic on McKinley Avenue (ECF Nos. 26 at 2, 38-1 at 12).  Officer Hannah noticed the vehicle because it "'is a vehicle that is commonly stolen, especially in this area.'"  (ECF No. 26 at 2.)  Intrigued, the officers made a U-turn and followed the vehicle for roughly half of a mile (ECF Nos. 38-2 at 3, 38-9), as Officer Bohny conducted a records check at 6:27:25 P.M. (ECF No. 38-4) to determine whether the vehicle was stolen (ECF No. 26 at 2).  Officer Bohny stated that, based on his training and experience, "the manner in which the Civic quickly pulled over and stopped, I believed the driver of the Civic was aware of our presence and attempting to avoid us."  (ECF No. 38-3 at 3.)

The records check clarified the vehicle was not stolen, and Defendant had not committed any traffic violations; however, the officers activated their patrol car's spotlights and parked, diagonally, a few feet behind Defendant's car, in the middle of the street, as Defendant came to a stop on a residential street.  (ECF Nos. 26 at 2, 38-5.)  The spotlights were directed at Defendant's driver-side window and the flood of light illuminated the interior cab.  (ECF No. 38-7.)

Officer Bohny went to the passenger side of the car, and Officer Hannah went to the driver's side to speak with Defendant.  (ECF Nos. 38-2, 38-3.)  An unidentified passenger who had exited the vehicle asked Officer Bohny if she was allowed to leave.  (ECF No. 38-1 at 7.)  Officer Bohny allowed her to leave.  (*Id*.)  Officer Hannah then asked Defendant if he lived at the house and whether he was on probation or parole.  (ECF No. 38-2 at 4.)  Defendant confirmed he was on probation,[1] and Officer Hannah asked Defendant to provide his driver's license.  (ECF Nos. 38-2 at 4, 38-7.)  At 6:27:53 P.M. Officer Hannah called the license in to dispatch, stating

---

[1] Defendant was on Formal Probation during this interaction, which included a probation term and condition requiring him to "submit [his] person and property to search and seizure."  (ECF No. 38-8 at 3.)

2

that Defendant "should be on probation." (ECF No. 38-4.) Officer Hannah then clipped the license to his shirt and ordered Defendant to exit the vehicle with both "hands up." (ECF No. 38-7.) Defendant turned off the ignition, took his keys, and calmly and immediately complied, stepping out of his vehicle and placing both hands on the roof. (*Id*.) As this occurred, Defendant asked—apparently confused, "where's [the passenger] going, in the house?" (ECF No. 38-6.) Officer Bohny confirmed. (*Id*.) Officer Hannah had one hand on Defendant's left hand and another hovering over Defendant's back as he asked, "You got anything on you you shouldn't have?" (ECF No. 38-7.) Defendant replied he had a gun. (*Id*.) The officers handcuffed Defendant and removed the gun from his waist. (ECF No. 38-6.) Officer Bohny began searching the vehicle. (*Id*.) During the search, the passenger called out to the officers, stating she left her cigarettes in the car. (*Id*.) Officer Bohny instructed her to stay back, and Officer Hannah directed her to wait inside. (ECF Nos. 38-6, 38-7.)

As Defendant sat on the curb and Officer Bohny searched the vehicle, Officer Hannah reported the address of the house to dispatch. (ECF No. 38-7.) Officer Hannah attempted to reassure Defendant, stating, "guys with guns are getting out left and right, you've got nothing to worry about." (*Id*.) At 6:29:47 P.M., dispatch stated Defendant was on county probation for "245." (ECF Nos. 38-4, 38-6.)[2] Shining a light into the gated driveway, Officer Hannah also ran the plates of the cars parked at the house where Defendant dropped off his passenger. (ECF No. 38-7.) As Officer Bohny searched Defendant's vehicle, Officer Hannah sat Defendant on the curb of the sidewalk and motioned for two other officers arriving on the scene to assist. (*Id*.)

Officer Hannah searched Defendant's person and found a bulldog mask in his pocket. (ECF No. 38-7.) Officer Hannah asked Defendant if he was still active, and Defendant affirmed. (*Id*.) The officers marked this incident as "gang-related." (ECF No. 38-1 at 2.) Officer Hannah then placed Defendant in the patrol car. (ECF No. 38-7.)

After placing Defendant in the back of the patrol car, Officer Bohny read Defendant his

---

[2] The record does not indicate the officers ever *verified* whether Defendant's probation included search and seizure term and never confirmed whether it was for a felony or misdemeanor, which would indicate whether Defendant was on formal probation or summary probation.

3

1  *Miranda* rights. (ECF No. 38-6.) Officer Bohny began asking Defendant questions about which
2  gang he was in, where he lived, and why he was on probation. (*Id*.) Defendant stated he was on
3  probation for "assault." (*Id*.) Officer Bohny asked Defendant why he had the gun and Defendant
4  stated it was for protection given recent crime in the area. (*Id*.) Officer Bohny continued to
5  question Defendant about the gun. (*Id*.) He then took Defendant out of the rear of the police
6  vehicle to give Defendant a cigarette. (*Id*.) The officers stated that because Defendant had
7  cooperated, they would not tow his car. (*Id*.) Officer Bohny retrieved Defendant's phone, which
8  was unlocked, from Defendant's vehicle and asked if he needed a number to call. (*Id*.) Officer
9  Bohny brought the phone over to Defendant and scrolled through Defendant's contacts at
10 Defendant's direction to find numbers he would be able to call. (*Id*.) Officer Bohny locked the
11 phone immediately after Defendant retrieved all needed numbers. (*Id*.)

## MOTION TO SUPPRESS

13  The Fourth Amendment states, "[t]he right of the people to be secure in their persons,
14 houses, papers, and effects, against unreasonable searches and seizures, shall not be violated."
15 U.S. Const. amend. IV. "[T]he 'seizure' of a 'person,' which can take the form of 'physical force'
16 or a 'show of authority' that 'in some way restrain[s] the liberty' of the person." *Torres v.*
17 *Madrid*, 141 S. Ct. 989, 995 (2021) (citing *Terry v. Ohio*, 392 U.S. 1, 19, n. 16 (1968)). Traffic
18 stops, "even if only for a brief period and for a limited purpose," are "seizures" within the
19 meaning of the Fourth Amendment, and therefore are "subject to the constitutional imperative
20 that [they] not be 'unreasonable' under the circumstances." *Whren v. United States*, 517 U.S.
21 806, 810 (1996); *see also United States v. Arvizu*, 534 U.S. 266, 273 (2002) (*Arvizu*); *United*
22 *States v. Colin*, 314 F.3d 439, 442 (9th Cir. 2002) ("The Fourth Amendment's prohibition against
23 unreasonable searches and seizures applies to investigatory traffic stops.") "A police-initiated
24 traffic stop is reasonable under the Fourth Amendment if the police stop the vehicle because of a
25 'reasonable suspicion' that the vehicle's occupants have broken a law." *United States v. Hartz*,
26 458 F.3d 1011, 1017 (9th Cir. 2006); *United States v. Lopez-Soto*, 543 F.3d 1080, 1087–1088 (9th
27 Cir. 2008). An officer making a traffic stop "must have a particularized and objective basis for
28 suspecting the particular person stopped of criminal activity," in light of the totality of the

4

circumstances. *United States v. Cortez*, 449 U.S. 411, 417–18 (1981); *see also United States v. Valdes-Vega*, 738 F.3d 1074, 1078 (9th Cir. 2013) (en banc). The reasonable suspicion standard is intentionally abstract, and courts are to give "due weight" to the factual inferences drawn by law enforcement officers. *Arvizu*, 534 U.S. at 273–77; *see also United States v. Edwards*, 761 F.3d 977, 983 (9th Cir. 2014) ("Reasonable suspicion 'is dependent upon both the content of information possessed by police and its degree of reliability,' and '[t]he standard takes into account the totality of the circumstances—the whole picture'"); *Hartz*, 458 F.3d at 1017 ("Reasonable suspicion exists if 'specific, articulable facts . . . together with objective and reasonable inferences' suggest that the persons detained by the police are engaged in criminal activity").

Even assuming that consent to search was voluntarily given, "evidence obtained subsequent to an illegal investigation is tainted by the illegality and thus inadmissible, notwithstanding . . . consent, unless subsequent events have purged the taint." *United States v. Washington*, 387 F.3d 1060, 1072 (9th Cir. 2004) (internal citation omitted); *see also United States v. Furrow*, 229 F.3d 805, 813 (9th Cir. 2000) ("For purposes of the Fourth Amendment, a determination that a consent was voluntarily made 'only satisfies a threshold requirement.' The mere fact of voluntariness does not mean that a consent is not tainted by a prior Fourth Amendment violation"), *overruled on other grounds*, *United States v. Johnson*, 256 F.3d 895 (2001) (en banc). In determining whether the taint stemming from a Fourth Amendment violation has been sufficiently purged, courts consider the temporal proximity between illegality and the consent, the presence of intervening circumstances, and the purpose and flagrancy of the official misconduct. *Brown v. Illinois*, 422 U.S. 590, 603–04 (1975); *Washington*, 387 F.3d at 1073.

It is the government's burden of establishing the admissibility of evidence obtained without a warrant. *See United States v. Shetler*, 665 F.3d 1150, 1157 (9th Cir. 2011) (noting that in determining whether statements were the product of an illegal search, "[i]t is the government's burden to show that evidence is not 'fruit of the poisonous tree'"); *United States v. Chamberlin*, 644 F.2d 1262, 1269 (9th Cir. 1980) (noting that determination of whether evidence was obtained by exploitation of an illegal act focuses on "the causal connection between the illegality and the

evidence; and, the burden of showing admissibility rests on the prosecution"); *see also United States v. Karo*, 468 U.S. 705, 719 (1984) (where unlawfully obtained information was "critical to establishing probable cause" the exclusionary rule applies).

## DISCUSSION

### A. The Officers Seized Defendant Within the Meaning of the Fourth Amendment.

Defendant argues his encounter with Officers Bohny and Hannah was not a consensual encounter, but rather a seizure within the meaning of the Fourth Amendment, as no reasonable person in his situation would believe they were free to leave. (ECF No. 26 at 3.) The government argues the officers initiated a consensual encounter with Defendant. (ECF No. 38 at 7.) The parties advance the same legal standard; a seizure occurs "only when, by means of physical force or a show of authority, [an individual's] freedom of movement is restrained." *United States v. Mendenhall*, 446 U.S. 544, 553 (1980). To determine whether a seizure requiring the protections of the Fourth Amendment has occurred, the government argues the following factors must be taken in to account: "(1) the number of officers; (2) whether weapons were displayed; (3) whether the encounter occurred in a public or non-public setting; (4) whether the officer's officious or authoritative manner would imply that compliance would be compelled; and (5) whether the officers advised the detainee of his right to terminate the encounter." (ECF No. 38 at 7–8.) An additional aspect, whether the individual submitted to the officer's show of authority, must also be considered. *See California v. Hodari D.*, 499 U.S. 621, 628 (1991) ["[*United States v.*]*Mendenhall*[, 446 U.S. 544 (1980)] establishes that the test for existence of a 'show of authority' is an objective one: not whether the citizen perceived that he was being ordered to restrict his movement, but whether the officer's words and actions would have conveyed that to a reasonable person"]; *see also Brendlin v. California*, 551 U.S. 249, 254 (2007) ["police officer may make a seizure by a show of authority and without the use of physical force, but there is no seizure without actual submission"].

#### 1. The Number of Officers

The government argues that "although there were two officers present, Officer Hannah was the sole officer who made initial contact with [Defendant]" as Officer Bohny spoke to the passenger and was "several feet away" from Defendant. (ECF No. 38 at 8.) Although the

6

number of officers does not alone establish whether a seizure occurred, here, it appears dispositive. *See People v. Tacardon*, 14 Cal. 5th 235, 251, (2022) [finding that one officer can effectuate a seizure where "the officer parked within a few feet of the defendant's car; 'bathed' the defendant with light; immediately approached with 'speed and surety,' . . . ; and asked an immediate, pointed question, which demanded an answer"].

As it relates to this case, there was no testimony or other evidence presented that either officer approached the Defendant in manner like that in *People v. Tacardon*. In fact, it appears that the officers were cordial, allowing the passenger to leave when she asked if she could, and speaking to the Defendant in a calm manner. This factor weighs in favor of finding that the encounter was consensual.

### 2. The Officers Did Not Brandish Weapons

The government argues that the officers never brandished their weapons, nor did they touch or threaten Defendant with their weapons or at all. (ECF No. 38 at 9.) There was no testimony or other evidence presented that contradicted the government's position and as such, this factors also weighs in favor of finding that the encounter was consensual.

### 3. The Officers Publicly Seized Defendant

Officer Hannah approached Defendant on a public street in a residential area. (ECF No. 38 at 8.) In response to Defendant's passenger request, the officers informed her that she was free to leave so there was no one else present to witness their interaction but again, that was solely based on the passenger's request. There was no testimony or evidence presented that the officers attempted to isolate the Defendant before seizing him. Furthermore, the seizure occurred after the officers learned that Defendant was on probation for PC 245. Because the officers publicly seized the Defendant, this factor also weighs in favor of finding that the encounter was consensual.

### 4. The Officers' Demeanor Indicated Compliance Was Not Compelled

The government argues that "[Defendant] parked his car on the side of the road voluntarily and not due to any show of authority by the police." (ECF No. 38 at 8.) The government argues the officers did not physically restrain Defendant and that the pre-search

1 contact was "exceptionally brief." (ECF No. 38 at 9.) Further, the government argues that the use of a patrol car spotlight is insufficient to constitute a show of force. *See People v. Tacardon*, 14 Cal. 5th 235, 244 (2022) ["Coupling the spotlight with the officer's parking the patrol car, [the defendant] rightly might feel himself the object of official scrutiny. However, such directed scrutiny does not amount to a detention"].

Defendant, argues that "none of the conduct by the officers would indicate he was free to disregard them" and that there was a "clear 'show of authority.'" (ECF No. 26 at 3.) Defendant argues those shows of authority include: 1) the officers parked their car behind Defendant, in the same manner as a traffic stop; 2) they activated the white spotlight of the patrol car; 3) both officers approached the vehicle, in full uniform; and 4) the officers told Defendant's passenger she could leave but did not tell Defendant he could leave. (ECF No. 26 at 3.)

Defendant argues the correct line of analysis is whether Defendant felt he was free to leave. (ECF No. 46.) Defendant argues that Officer Bohny's interaction with the passenger demonstrates that the people in that vehicle did not feel free to leave as demonstrated by the fact the passenger had to *ask* if she was free to leave. (*Id*.) He argues that the Officer's response to the passenger as he continued to approach the vehicle after she had just exited the vehicle—that *she* was free to go—indicated to the driver that he was not free to go. (*Id*.)[3] The government argues that Defense applies the incorrect standard, a subjective standard of whether the scrutinized person in their circumstance felt free to leave. (*Id*.) The government argues the correct standard is an objective reasonableness standard, arguing officers are not required to tell those they attempt to consensually encounter that they are in fact free to leave or terminate the encounter. (*Id*.) Defendant argues the officers created an atmosphere in which he felt singled out for scrutiny, and therefore not allowed to leave. (*Id*.)

The government is correct. The totality of the circumstances determines whether a reasonable person would feel free to leave or terminate an interaction with an officer. "The record does not reflect that the police activated a siren or flashers; or that they commanded

---

[3] The government implies the passenger exited the vehicle after the officers approached; however, it is unclear from the record whether this is case or whether she was already outside of the car. (ECF No. 46.)

8

1 respondent to halt or displayed any weapons; or that they operated the car in an aggressive
2 manner to block respondent's course or otherwise control the direction or speed of his
3 movement." *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988).  As in *Chesternut*, the record
4 here does not reflect the officers activated their emergency lights, that they issued any commands
5 or orders to Defendant, that they brandished their weapons, or that they necessarily corralled
6 Defendant.  Furthermore, the officers did not park their patrol car in a way that would completely
7 impede Defendant's ability to drive away from the interaction after dropping off his passenger.
8     Accordingly, the Court finds this factor weighs in favor of finding that the encounter was
9 consensual.

10     **5.  The Officers Never Informed Defendant of His Right to Leave.**
11     The government argues that the officers' failure to notify Defendant that he had a right to
12 leave does not transform the encounter into a stop requiring reasonable suspicion.  (ECF No. 38 at
13 9–11.)  Further, the government argues that because Defendant's passenger was allowed to exit
14 the vehicle, the consensual nature of the encounter was made apparent.  (ECF No. 38 at 9–11.)
15     The government is correct.  *See Brendlin v. California*, 551 U.S. 249, 257, 127 S. Ct.
16 2400, 2406–07, 168 L. Ed. 2d 132 (2007) ["any reasonable passenger would have understood the
17 police officers to be exercising control to the point that no one in the car was free to depart
18 without police permission"].  The facts indicate Defendant may have heard the interaction
19 between his passenger and Officer Bohny.  *See People v. Tacardon*, 14 Cal. 5th 235, 254, 521
20 (2022) ["the critical factual question was whether Tacardon overheard or otherwise perceived the
21 deputy's interaction with the passenger"].  For example, the car windows were open, and Officer
22 Bohny approached the passenger side of the vehicle near the time the passenger exited the
23 vehicle.
24     Because this factor may be communicated directly or indirectly, this factor weighs in
25 favor of finding that the encounter was consensual.
26 ///
27 ///
28 ///

9

**6. Conclusion**

The dispositive factor, whether the officer's conducted themselves in a way that would compel submission, is not met. Thus, the Court finds the encounter consensual.[4]

## CONCLUSION

Accordingly, for the reasons set forth above, the Court DENIES Defendant's motion to suppress. (ECF No. 26.)

IT IS SO ORDERED.

Dated:   August 10, 2023

UNITED STATES DISTRICT JUDGE

---

[4] Because the Court does not find the officers seized the Defendant, there is no need to advance to the reasonable cause prong of the legal inquiry.